# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 19-112V
Filed: January 20, 2023

| | | |
|---|---|---|
| * * * * * * * * * * * * * | | |
| RILEY TRUTTMANN, | * | Not For Publication |
| | * | |
| Petitioner, | * | |
| v. | * | Motion for Attorneys' Fees and Costs; |
| | * | Reasonable Basis. |
| SECRETARY OF HEALTH | * | |
| AND HUMAN SERVICES, | * | |
| | * | |
| Respondent. | * | |
| * * * * * * * * * * * * * | | |

*Richard Gage, Esq.*, Richard Gage, P.C., Cheyenne, WY, for petitioner.
*Lara Englund, Esq.*, U.S. Dept. of Justice, Washington, DC, for respondent.

## DECISION ON ATTORNEYS' FEES AND COSTS[1]

**Roth**, Special Master:

On January 22, 2019, Riley Truttmann ("petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq.*[2] (the "Vaccine Act" or "Program"). Petitioner alleged that she developed alopecia after receiving human papillomavirus ("HPV" or "Gardasil") vaccines on April 25, 2016, June 29, 2016, and January 18, 2017.[3] *See* Petition at 1, ECF No. 1. A Dismissal Decision for failure to prosecute and failure to follow Court Orders was issued on June 12, 2020. ECF No. 28.

---

[1] Because this unpublished decision contains a reasoned explanation for the action in this case, it will be posted on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002 (codified as amended at 44 U.S.C. § 3501 note (2012)). In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to delete medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will delete such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755 (1986). Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

[3] The petition alleges only the April 25, 2016 HPV vaccine as the cause of petitioner's alopecia. *See* Petition at 2, ECF No. 1.

1

On January 8, 2021, petitioner filed a Motion for Attorneys' Fees and Costs pursuant to Section 15(e) of the Vaccine Act. ECF No. 31 ("Motion"). On January 22, 2021, respondent filed a response opposing petitioner's Motion and raising an objection as to reasonable basis in the filing of the petition. ECF No. 32 ("Response"). After being ordered to substantively address the issue of reasonable basis, respondent filed a second response on February 23, 2021. ECF No. 34 ("Second Response"). Petitioner did not file a reply.

Petitioner seeks attorneys' fees and costs in the total amount of **$15,815.20**, representing $13,604.60 in attorneys' fees and $2,210.60 in costs. *See* Motion.

After careful consideration, petitioner's Motion for Attorneys' Fees and Costs is **granted in part** for the reasons set forth below.

## I.   Background

### A.  Procedural History

Petitioner filed her claim on January 22, 2019, alleging that she developed alopecia as a result of an HPV vaccine she received on April 25, 2016. *See* Petition at 1, 2, ECF No. 1. Petitioner filed medical records on March 25, 2019. Petitioner's Exhibits ("Pet. Ex.") 1-5, ECF No. 9.

Respondent filed his Rule 4(c) report on July 23, 2019. ECF No. 14. Petitioner was then ordered to file an expert report by October 21, 2019. Petitioner filed additional medical records on August 22, 2019. Pet. Ex. 7-9, ECF No. 15.

Petitioner filed five Motions for Extension of Time to file an expert report between her initial deadline of October 21, 2019 and April 15, 2020, all of which were granted. ECF No. 20-23, 25-26. Petitioner was advised in the last Order that no further extensions would be granted. ECF No. 26. Petitioner failed to timely file an expert report or otherwise communicate with the court and an Order to Show Cause was issued. ECF No. 27. Petitioner failed to respond to the Order to Show Cause by June 9, 2020 as directed. Accordingly, the case was dismissed on June 12, 2020 for failure to prosecute and comply with Court Orders. ECF No. 28.

On January 8, 2021, petitioner filed a Motion for Attorneys' Fees and Costs. Motion, ECF No. 31. Respondent filed a response to the Motion on January 22, 2021, raising reasonable basis. Response, ECF No. 32. Respondent's counsel was ordered to file a response that substantively addressed the issue of reasonable basis by February 23, 2021. ECF No. 33. Respondent filed a second response on February 23, 2021, detailing his reasons for raising reasonable basis. Second Response, ECF No. 34. Petitioner did not file a reply.

This matter is now ripe for consideration.

**B. Summary of Relevant Medical Records**

**1. Petitioner's Medical History Prior to Receiving the First HPV Vaccine on April 25, 2016.**

Petitioner was born on September 20, 1998, was a well child and received her routine immunizations without event. Pet. Ex. 1 at 1, 4. She suffered from normal childhood illnesses.

On November 1, 2014, petitioner, then 15 years old, presented to her pediatrician at North Shore Pediatrics for ringworm on her chest, torso, and back. Pet. Ex. 1 at 48. The assessment was pityriasis rosea.[4] *Id*. at 49.

At a well child visit on August 21, 2015, petitioner reported struggling with acne but was otherwise healthy. Pet. Ex. 1 at 217.

Petitioner presented to a dermatologist, Dr. John Yadgir for her acne on March 23, 2016. Pet. Ex. 2 at 1. Ketoconazole (Nizoral) 2% shampoo, clindamycin-benzoyl peroxide (Benzaclin) gel, and tretinoin (Retin-A) 0.05% cream were prescribed. *Id*. at 3.

Petitioner received her first HPV vaccine on April 25, 2016. Pet. Ex. 1 at 322, 450.

**2. Petitioner's Medical History Following Receipt of the First HPV Vaccination.**

Petitioner next presented to her pediatrician with the flu on May 5, 2016. Pet. Ex. 1 at 277, 274.

On June 16, 2016, petitioner's mother telephoned the pediatrician to report that petitioner had hair loss since having the flu. Pet. Ex. 1 at 309. She reported large amounts of hair lost when brushing her hair but there were no bald spots. *Id.* The pediatrician thought her symptoms were due to her recent flu illness but recommended that petitioner come in for a visit to check her thyroid function. *Id.* at 310.

---

[4] Pityriasis rosea is a common, acute or subacute, self-limited, exanthematous disease of unknown etiology, whose onset is marked by a solitary pink, reddish, or tan plaque, usually on the trunk, upper limbs, or thighs; subsequent lesions are similar to this but smaller, with vesicular borders, tending to peel and produce a scaly collarette. *Pityriasis rosea, Dorland's Medical Dictionary Online,* https://www.dorlandsonline.com/dorland/definition?id=97933&searchterm=pityriasis+rosea (last visited, Jan. 9, 2023).

3

As directed, petitioner presented to the pediatrician on June 29, 2016 for hair loss since having the flu two months ago. Pet. Ex. 1 at 329. The pediatrician believed the hair loss to be most likely telogen effluvium[5] triggered by her recent febrile illness. *Id.* at 330. Petitioner received a second HPV vaccine in her left deltoid at that visit. *Id.* at 330, 348.

Petitioner also presented to Dr. Yadgir on June 29, 2016 for follow up of her acne. Pet. Ex. 2 at 9, 13. She was also treated for burns to three fingers that occurred at a campfire. *Id*. at 12,14.

### 3. Petitioner's Medical History Following Receipt of the Second HPV Vaccination.

At her well child visit on August 29, 2016, petitioner again reported hair loss starting a month after having the flu. Pet. Ex. 1 at 350. Previous blood work for thyroid function was normal. *Id.* She was referred to a dermatologist who specialized in hair loss. *Id.* at 352, 378.

On September 13, 2016, petitioner's mother contacted the pediatrician to report a rash on petitioner's cheek. Pet. Ex. 1 at 392. Petitioner had recently begun taking 1 tsp of coconut oil a day and was advised to stop since that was the only change since the rash started. *Id.* The following day, petitioner presented to the pediatrician. The rash was diagnosed as folliculitis.[6] *Id*. at 406, 408. She was prescribed cephalexin (Keflex), an oral antibiotic. *Id*. at 408.

Petitioner presented to Dr. Kristen Holland, a dermatologist on October 6, 2016 for hair loss which she reported was less now, but the density of her hair had decreased. Pet. Ex. 3 at 1, 4-5. *Id.* at 4. Dr. Holland noted that petitioner's blood work was "normal except for slightly elevated" thyroid stimulating hormone ("TSH") levels. *Id*. Dr. Holland agreed the diagnosis was telogen effluvium. Biotin supplements and ketoconazole shampoo were recommended. *Id.* at 5.

Petitioner received a third HPV vaccine in her left deltoid on January 18, 2017. Pet. Ex. 1 at 450.

---

[5] Telogen effluvium is the early, excessive, temporary loss of hairs from normal resting follicles in the scalp as a result of traumatization by some stimulus (e.g., high fever, certain diseases, or with psychogenic stress). The normal hair cycle is changed and the anagen phase ends prematurely, moving into the catagen and telogen phases. *Telogen effluvium, Dorland's Medical Dictionary Online,* https://www.dorlandsonline.com/dorland/definition?id=72549&searchterm=telogen+effluvium (last visited, Jan. 9, 2023).

[6] Folliculitis is defined as inflammation of follicles, typically hair follicles. *Folliculitis*, *Dorland's Medical Dictionary Online,* https://www.dorlandsonline.com/dorland/definition?id=18992&searchterm=folliculitis (last visited, Jan. 9, 2023).

**4. Petitioner's Medical History Following Receipt of the Third HPV Vaccination.**

On February 15, 2017, petitioner returned to Dr. Yadgir for follow up of her acne. Pet. Ex. 2 at 16. Her dose of Retin-A was adjusted, and tacrolimus (Protopic) 1% ointment prescribed. *Id*. at 18.

On June 30, 2017, petitioner telephoned the pediatrician's office to report the return of hair loss. Pet. Ex. 1 at 437. She was advised to return to the dermatologist. *Id*.

Petitioner returned to Dr. Yadgir on July 5, 2017 rather than Dr. Holland. Her "history was suggestive of telogen effluvium after an episode of influenza." Pet. Ex. 3 at 37. Although she reported improvement in her hair loss since her October 7, 2016 visit, a bald spot was noted on her mid frontal scalp a few weeks ago. *Id*. On examination, she had "several round smooth patches of alopecia on her mid-frontal and scattered on her occipital scalp . . . Normal eyebrows and eyelashes." *Id*. The assessment was alopecia areata.[7] Olux[8] foam was prescribed. *Id.*

On July 25, 2017, petitioner's mother telephone Dr. Yadgir to inquire whether the HPV series may have contributed to petitioner's alopecia areata. Pet. Ex. 2 at 68. When petitioner presented to Dr. Yadgir the next day, she reported first noticing hair loss around June 20, 2017.[9] *Id*. at 70, 73. Dr. Yadgir's assessment was alopecia areata "[p]ossibly related to Gardasil (but listed as rare complication of vaccine series)." *Id*. at 74. He instructed her to continue using the Olux 0.05% foam. *Id*. at 74-75.

Petitioner presented to Dr. Englebert, the pediatrician, on August 14, 2017 for a well child visit. Pet. Ex. 1 at 479. Her alopecia areata was being managed by a dermatologist. *Id*. at 481. Petitioner's mother expressed concern that petitioner's alopecia was caused by the HPV vaccine. *Id.* at 482. Dr. Englebert informed petitioner and her mother that it was unlikely that her alopecia was caused by the HPV vaccine but was also doubtful a cause would ever be determined. However, a report of a possible adverse event to the vaccine manufacturer would be made. *Id*. at 484.

---

[7] Alopecia areata is a patchy, nonscarring, asymmetric hair loss that is sometimes reversible and occurs in sharply defined areas of the scalp. The etiology is unknown; in some patients there may be an autoimmune component, and in others genetic factors may play a role. *Alopecia areata, Dorland's Medical Dictionary Online,*
https://www.dorlandsonline.com/dorland/definition?id=55451&searchterm=alopecia+areata (last visited, Jan. 9, 2023).

[8] Olux, also known as clobetasol propionate, is a very high-potency synthetic corticosteroid, an analogue of prednisolone. It is used topically for the relief of inflammation and pruritus in corticosteroid-responsive dermatoses. *Clobetasol propionate, Dorland's Medical Dictionary Online,*
https://www.dorlandsonline.com/dorland/definition?id=10122 (last visited, Jan. 9, 2023).

[9] Petitioner initially reported hair loss on June 16, 2016 after having the flu in May of 2016. *See* Pet. Ex. 1 at 309. On July 26, 2017, petitioner reported being recently diagnosed with alopecia areata with hair loss "[f]irst noticed around 6/20/2017." Pet. Ex. 2 at 73.

At her visit with Dr. Yadgir on August 28, 2017, her alopecia had progressed despite daily use of the Olux foam. Pet. Ex. 2 at 79.

Petitioner went away to college and presented to Dr. Sheila Krishna on September 5, 2017 for hair loss that had not improved with the use of clobetasol. Pet. Ex. 2 at 90-91; Pet. Ex. 5 at 1. Dr. Krishna documented worsening symptoms of hair loss of the head but no loss of hair on her body. Pet. Ex. 2 at 90. Petitioner was instructed to take iron and vitamin D supplements in addition to using the Olux foam. *Id.* at 91. Dr. Krishna advised that triggers for telogen effluvium include stress, illness, iron deficiency, thyroid disease, and medications. *Id.* Petitioner began a series of Kenalog steroid injections to her scalp. *Id.* at 95; Pet. Ex. 5 at 2. She received additional steroid injections from Dr. Krishna on October 6, 2017. Pet. Ex. 5 at 16-17.

On October 16, 2017, petitioner's mother called the pediatrician to report that petitioner was seeing a dermatologist in San Diego, where she was in college, for her alopecia and receiving steroid injections to her scalp; yet petitioner had lost about 80% of the hair on her scalp. Sulfasalazine[10] had also been recommended. Pet. Ex. 1 at 509.

Petitioner returned to Dr. Krishna on October 20, 2017 for additional steroid injections. Pet. Ex. 5 at 20. Petitioner reported now losing the hair on her arms and legs. Dr. Krishna diagnosed her with alopecia universalis.[11] *Id.*

On October 30, 2017, petitioner presented to another dermatologist, Dr. Judith Koperski for worsening alopecia. Pet. Ex. 5 at 25, 52. She had lost approximately 95% of the hair on her head. *Id.* at 25. Petitioner reported that the hair loss "[s]tarted 4 months ago in June 2017"[12] and believed that it might have been triggered by the HPV vaccine. *Id.* Dr. Koperski opined that petitioner's alopecia areata was "evolving toward alopecia universalis" but it was "very unlikely that the Gardasil vaccine caused this." *Id.* at 26.

Petitioner returned to Dr. Krishna on November 17, 2017 for "severe" alopecia areata. Pet. Ex. 5 at 29.

---

[10] Sulfasalazine is an antibacterial sulfonamide. *Sulfasalazine, Dorland's Medical Dictionary Online,* https://www.dorlandsonline.com/dorland/definition?id=47968&searchterm=sulfasalazine (last visited, Jan. 9, 2023).

[11] Alopecia universalis is loss of hair over the entire body, resulting from progression of alopecia areata. *Universal alopecia, Dorland's Medical Dictionary Online,* https://www.dorlandsonline.com/dorland/definition?id=55503 (last visited, Jan. 9, 2023).

[12] Petitioner's report of onset in June of 2017, five months after her third HPV vaccine, is inconsistent with her medical records from 2016 documenting hair loss that began in June of 2016. *See* Pet. Ex. 1 at 309.

Petitioner sought medical care for swelling on the right side of her neck on December 13, 2017. Pet. Ex. 4 at 83. Her recent thyroid function tests were normal. *Id*. An ultrasound of her thyroid was ordered, and it was recommended that she check with her specialist to see if the swelling could be related to her medications. *Id*. at 84.

On December 15, 2017, petitioner returned to Dr. Krishna. Pet. Ex. 5 at 33. She had some regrowth of hair on her scalp but "worsening on the face." *Id*. Her alopecia was noted as "active, severe, and extensive." *Id*. at 34. Petitioner received additional steroid injections to her scalp. *Id*. Petitioner followed up with Dr. Krishna on February 2, 2018, Pet. Ex. 5 at 36; March 23, 2018, Pet. Ex. 5 at 40; and May 18, 2018, Pet. Ex. 5 at 44.

In April of 2018, petitioner presented to student health on several occasions for "peeling" on the bottom of her feet and for strep. Pet. Ex. 4 at 88, 90, 91, 100-102. An ultrasound of petitioner's thyroid performed on May 30, 2018 was normal. *Id*. at 123.

Petitioner presented to Dr. Yadgir on June 12, 2018 and July 17, 2018 for steroid injections. Pet. Ex. 7 at 1, 4, 5, 17. She presented to Dr. Yadgir again on July 25, 2018 for a "fibrous papule with telang" and received pulsed dye laser V-Beam[13] therapy. *Id*. at 23, 41. She received steroid injections to the scalp on August 21, 2018. *Id*. at 28, 30-31.

On August 23, 2018, petitioner consulted with a rheumatologist, Dr. Arnold Lim, for abnormal serologies. Pet. Ex. 8 at 5. Petitioner was found to have positive antinuclear antibodies[14] and weak titer double-stranded DNA. *Id*. Dr. Lin wrote, "[b]ased on today's evaluation and available information, [petitioner] does not have enough features" to meet the criteria for lupus. *Id*. at 7. Dr. Lim recommended additional testing. *Id.* at 7-8.

No further records were filed.

C. **Affidavit of Petitioner Riley Truttmann**

Petitioner affirmed receipt of the HPV vaccine series on April 25, 2016, June 29, 2016, and January 18, 2017. Pet. Ex. 6 at 1. She noticed large amounts of hair loss while brushing her hair after receiving the April 25, 2016 HPV vaccine and her hair loss worsened with each subsequent

---

[13] The V-Beam is a laser that delivers rapid bursts of gentle light wavelengths to the skin. *Vbeam Laser,* American Skin Institute, *https://americanskininstitute.com/treatments-procedures/lasers-devices/vbeam-laser/* (last visited, Jan. 9, 2023).

[14] Antinuclear antibodies are antibodies directed against nuclear antigens and are almost invariably found in systemic lupus erythematosus. Serologic tests are often used to determine antibody titers against specific antigens. *Antinuclear antibodies, Dorland's Medical Dictionary Online,* https://www.dorlandsonline.com/dorland/definition?id=56804&searchterm=antinuclear+antibodies (last visited, Jan. 9, 2023).

7

vaccination until she was diagnosed with alopecia areata. *Id*. Her diagnosis changed to alopecia universalis upon losing most of the hair on her scalp, her eyelashes, and some hair on her torso and arms. *Id*.

Petitioner affirmed taking a "powerful immune modulator" and receiving regular cortisone injections. Pet. Ex. 6 at 2. She stated that she has since had some hair regrowth, although she continues to wear a wig. *Id*.

## II. Discussion

The Vaccine Act permits an award of "reasonable attorneys' fees" and "other costs." § 15(e)(1). If a petition results in compensation, petitioner is entitled to reasonable attorneys' fees and costs. *Id.*; *see Sebelius v. Cloer*, 133 S. Ct. 1886, 1891 (2013). Where a petitioner does not prevail on entitlement, a special master has discretion to award reasonable fees if the petition was brought in "good faith" and with a "reasonable basis" for the claim to proceed. § 15(e)(1). A petitioner's good faith is presumed "in the absence of direct evidence of bad faith." *Grice v. Sec'y of Health & Human Servs.*, 36 Fed. Cl. 114, 121 (1996). Where no evidence of bad faith exists and respondent does not challenge petitioner's good faith, good faith requires no further analysis.

In the instant case, the undersigned has no basis to believe, and respondent does not argue, that petitioner did not bring her claim in good faith. Therefore, the undersigned finds that the petitioner brought her claim in good faith.

### A. Reasonable Basis

#### 1. Legal Standard

In discussing the reasonable basis requirement, the Federal Circuit stressed the prima facie petition requirements of § 11(c)(1) of the Act. *Cottingham ex. rel. K.C. v. Sec'y of Health & Human Servs.*, 971 F.3d 1337, 1345-46 (Fed. Cir. 2020). Specifically, the petition must be accompanied by an affidavit and supporting documentation showing that the vaccinee:

> (1) received a vaccine listed on the Vaccine Injury Table;
> (2) received the vaccination in the United States, or under certain stated circumstances outside of the United States;
> (3) sustained (or had significantly aggravated) an injury as set forth in the Vaccine Injury Table (42 C.F.R. § 100.3(e)) or that was caused by the vaccine;
> (4) experienced the residual effects of the injury for more than six months, died, or required an in-patient hospitalization with surgical intervention; and
> (5) has not previously collected an award or settlement of a civil action for damages for the same injury.

*Cottingham*, 971 F.3d at 1345-46.

Reasonable basis is an objective inquiry, irrespective of counsel's conduct or a looming statute of limitations, that evaluates the sufficiency of records available at the time a claim is filed. *Simmons v. Sec'y of Health & Human Servs.*, 875 F.3d 632, 636 (Fed. Cir. 2017); *see Turpin v. Sec'y of Health & Human Servs.*, No. 99-564, 2005 WL 1026714 at *2 (Fed. Cl. Spec. Mstr. Feb. 10, 2005). A special master's evaluation of reasonable basis focuses on the requirements for a petition under the Vaccine Act to determine if the elements have been asserted with sufficient objective evidence to make a feasible claim for recovery. *Santacroce v. Sec'y of Health & Human Servs.*, No. 15-555V, 2018 WL 405121 at *7 (Fed. Cl. 2018).

Reasonable basis is satisfied when there is more than a mere scintilla of objective evidence, such as medical records or medical opinions, supporting a feasible claim before filing. *See Cottingham*, 971 F.3d at 1346; *see Chuisano v. Sec'y of Health & Human Servs.*, 116 Fed. Cl. 276, 286 (2014) (citing *McKellar v. Sec'y of Health & Human Servs.*, 101 Fed. Cl. 303, 303 (2011)); s*ee Silva v. Sec'y of Health & Human Servs.*, 108 Fed. Cl. 401, 405 (2012). A recent attempt to clarify what quantifies a "scintilla" looked to the Fourth Circuit, which characterized "more than a mere scintilla of evidence" as "evidence beyond speculation that provides a sufficient basis for a reasonable inference of causation." *Cottingham v. Sec'y of Health & Human Servs.,* 154 Fed. Cl. 790, 795 (2021) (quoting *Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 765 (4th Cir. 2021)). Additionally, absence of an express medical opinion of causation is not necessarily dispositive of whether a claim has a reasonable basis. Medical records may support causation even where the records provide only circumstantial evidence of causation. *James-Cornelius on Behalf of E.J. v. Sec'y of Health & Human Servs.*, 984 F.3d 1374, 1379-80 (Fed. Cir. 2021).

Evaluation of reasonable basis is limited to the objective evidence submitted. *Simmons*, 875 F.3d at 636. Still, a special master is not precluded from considering objective factors such as "the factual basis of the claim, the novelty of the vaccine, and the novelty of the theory of causation." *Amankwaa v. Sec'y of Health & Human Servs.*, 138 Fed. Cl. 282, 289 (2018). In *Cottingham*, the Federal Circuit expressly clarified that special masters are permitted to utilize a totality of the circumstances inquiry in evaluating reasonable basis, including, but not exclusively limited to, objective factors such as those identified in *Amankwaa*. *See Cottingham,* 971 F.3d at 1344. The Federal Circuit reiterated that counsel conduct is subjective evidence not to be considered when evaluating reasonable basis. *Id*. at 1345. Counsel's attempt or desire to obtain additional records before filing is subjective evidence and does not negate the objective sufficiency of evidence presented in support of a claim. *James-Cornelius,* 984 F.3d at 1381. The Federal Circuit has additionally articulated that special masters cannot broadly categorize all petitioner affidavits as subjective evidence or altogether refuse to consider petitioner's sworn statements in evaluating reasonable basis. *Id*. at 1380 (holding that factual testimony, when corroborated by medical records and a package insert, can amount to relevant objective evidence for supporting causation). However, a petitioner's own statements cannot alone support reasonable basis, and special masters may make factual determinations as to the weight of evidence. *See, e.g., Chuisano*, 116 Fed. Cl. at 291; *Foster v. Sec'y of Health & Human Servs.*, No. 16-1714V, 2018 WL 774090, at *3 (Fed. Cl. Spec. Mstr. Jan. 2, 2018); *Cottingham*, 971 F.3d at 1347.

While absent or incomplete records do not strictly prohibit a finding of reasonable basis,

9

an overwhelming lack of objective evidence will not support reasonable basis. *Chuisano*, 116 Fed. Cl. at 288; *see Simmons,* 875 F.3d at 634-36 (holding that reasonable basis was not satisfied where 1) petitioner's medical record lacked proof of vaccination and diagnosis and 2) petitioner disappeared for two years before filing a claim). The objective evidence in the record must also not be so contrary that a feasible claim is not possible. *Cottingham*, 154 Fed. Cl. at 795, citing *Randall v. Sec'y of Health & Human Servs.,* No. 18-448V, 2020 WL 7491210, at *12 (Fed. Cl. Spec. Mstr. Nov. 24, 2020) (finding no reasonable basis when petitioner alleged a SIRVA injury in his left arm though the medical records indicated that the vaccine was administered in petitioner's right arm). A claim may lose reasonable basis as it progresses if further evidence is unsupportive of petitioner's claim. *See R.K. v. Sec'y of Health & Hum. Servs.,* 760 F. App'x 1010, 1012 (Fed. Cir. 2019) (citing *Perreira v. Sec'y of Health & Human Servs.,* 33 F.3d 1375, 1376–77 (Fed. Cir. 1994)).

Though a special master has broad discretion, a special master must keep in mind the Vaccine Act's remedial objective of maintaining petitioners' access to willing and qualified legal assistance, and a special master may not abuse their discretion in denying reasonable basis and fees. *See James-Cornelius,* 984 F.3d at 1381.

### B. The Parties' Arguments

#### 1. Respondent's Argument

Following the filing of a response to petitioner's Motion for Attorneys' Fees and Costs, raising reasonable basis but leaving the determination to the special master, respondent was ordered to submit a substantive response detailing his reasoning for raising reasonable basis. *See generally* Response; ECF No. 33. In a Second Response to the Motion for Attorneys' Fees and Costs, respondent argued that petitioner requested five extensions of time within which to file an expert report, failed to file an expert report, failed to otherwise communicate with the Court regarding the expert report then failed to respond to an Order to Show Cause that was issued. Second Response at 2. Accordingly, petitioner's case was dismissed for failure to prosecute and failure to follow Court orders. *Id*.; *see also* ECF No. 28.

Respondent submitted that the Vaccine Act affords Special Masters discretion to determine an award of attorneys' fees and costs even to an unsuccessful petitioner, but an award is only appropriate if the petition was brought in good faith and there was a reasonable basis for the claim. Second Response at 6, citing 42 U.S.C. § 300aa-15(e)(1). He stated that determining good faith is subjective, while reasonable basis is objective and relates to the "factual basis" or "merits of petitioner's claim." Second Response at 6-7, citing *Simmons*, 875 F.3d at 633-36.

Respondent argued that in this case the "objective evidence in the medical records does not establish a reasonable basis for the claim." Second Response at 8. None of petitioner's treating physicians believed the HPV vaccine was causally linked to petitioner's alopecia. *Id*. at 9. The "only apparent reference to a possible causal nexus" was when petitioner's mother raised the

10

possibility of a connection with Dr. Yadgir over a year after vaccination and Dr. Yadgir documented that petitioner's alopecia was "possibly related to Gardasil (but listed as rare complication of vaccine series)," but offered no basis for that statement. *Id*., citing Pet. Ex. 2 at 68, 74. Additionally, when the HPV vaccines were raised with the pediatrician, she responded that the cause of petitioner's alopecia was unlikely to be determined. Second Response at 9, Pet. Ex. 1 at 484. Further, Dr. Koperski believed it was highly unlikely that her condition was caused by the HPV vaccine. Second Response at 9, citing Pet. Ex. 5 at 26.

Respondent acknowledged that petitioner is not required to prove causation by a preponderance of evidence to demonstrate reasonable basis. Second Response at 9. However, petitioner is required to provide more than a scintilla of evidence to demonstrate reasonable basis. *Id*. An unsupported notation in Dr. Yadgir's records was insufficient to meet that burden. *Id*. Further, petitioner failed to provide medical literature, an expert report, or any objective support for her claim, despite having nearly a year to do so. *Id*.

Respondent concluded that "absent objective evidence that the HPV vaccine caused petitioner's alleged injury, the claim had no feasibility, and petitioner failed to establish a reasonable basis for the claim." Second Response at 10.

### 2. Petitioner's Argument

Petitioner did not reply or otherwise respond to Respondent's submissions.

### III. Analysis of Reasonable Basis

Consistent with *Cottingham*, petitioner has filed contemporaneous and facially trustworthy medical records demonstrating: (1) that petitioner received a covered vaccine; (2) that the vaccine was administered in the United States; (3) that petitioner experienced symptoms she alleges are associated with her vaccine; and (4) that these symptoms persisted for at least six months. 971 F.3d at 1345-46. Petitioner affirmed in her affidavit that she has not previously collected an award or settlement for the alleged vaccine injury. Pet. Ex. 6 at 2.

Petitioner suffered from alopecia that began in the months following receipt of her first HPV vaccine. *See* Petition; Pet. Ex. 1 at 479-81, 509; Pet. Ex. 3 at 37; Pet. Ex. 5 at 20. Additionally, petitioner was treated for alopecia from June 2016 to August 2018, satisfying the six months requirement. Pet. Ex. 1 at 309-10; Pet. Ex. 7 at 30-31. Petitioner alleged that the HPV vaccine caused her injury. The HPV vaccine is covered by the Vaccine Injury Table. 42 C.F.R. § 100.3(a). Alopecia is not a Table Injury associated with the HPV vaccine; thus, this is an off-Table claim. *See id*.

Petitioner alleged that she suffers from alopecia caused by the HPV vaccine she received on April 25, 2016. *See* Petition. Respondent argued that petitioner failed to provide more than a

11

mere scintilla of evidence in support of her claim and therefore, the claim did not have a reasonable basis when brought. Second Response at 9-10; Response at 1, 4.

Alopecia is generally accepted to be an autoimmune disease.[15] In a recent ruling in favor of petitioner, the Chief Special Master found that a vaccine caused petitioner's alopecia areata. He noted that in the medical community, alopecia is "widely understood to be an autoimmune disease." *See DeLozier v. Sec'y of Health & Human Servs*., No. 15-124V, 2019 WL 7556051, at *1, *5, *15, *19. (Fed. Cl. Spec. Mstr. Dec. 10, 2019). Although the vaccine involved in *DeLozier* was a Hepatitis B vaccine—not HPV—it is still relevant. The ruling provides support for the feasibility of petitioner's claim that alopecia areata can be caused-in-fact by a vaccine.[16]

In this case, petitioner's medical records and affidavit reflect a temporally proximate relationship between the HPV vaccine she received on April 25, 2016 and the onset of her hair loss. On June 16, 2016, petitioner presented with complaints of losing large amounts of hair since having the flu on May 5, 2016 (or ten days after receipt of the first HPV vaccine). Pet. Ex. 1 at 277, 274, 309. Petitioner received a second HPV vaccine at that visit. *Id.* at 330, 348. At a visit on August 29, 2016, petitioner again reported hair loss starting a month after having the flu (or in June, two months after the first HPV vaccine).[17] *Id*. at 350.

During the course of treatment for her alopecia, petitioner received regular steroid and immune modulating therapies to promote hair growth. *See* Pet. Ex. 2 at 95; Pet. Ex. 5 at 2, 16-17, 20, 33-34; Pet. Ex. 6 at 2. While petitioner would not have been able to testify to the medical significance of her treatment, she would have been able to testify to her receipt of the HPV vaccines, the onset of her symptoms, her treatment, and the subsequent course of her symptoms after treatment. *See James-Cornelius,* 984 F.3d at 1379-81. Thus, petitioner's belief—that her alopecia was caused by the HPV vaccine—has some basis in fact. The statements of the treating physicians discussed below provide further support for reasonable basis in the filing of this claim and until its dismissal.

Respondent argued that "petitioner has not identified (nor has respondent located) any notation in the medical records indicating that her treating physicians believed the HPV vaccine likely played any role in causing her condition." Second Response at 9. He also pointed out that petitioner failed to provide an expert report in support of her claim. *Id*.

---

[15] *See* note 7 *supra*.
[16] Petitioner's counsel of record in this matter also represented the petitioner in *DeLozier*.
[17] Petitioner received a third HPV vaccine on January 18, 2017. Pet. Ex. 1 at 450. The medical records later document that she reported onset as June 2017 rather than 2016. *See* Pet. Ex. 2 at 70, 73; Pet. Ex. 5 at 25. This would have raised an issue of fact; however, that matters little in the context of reasonable basis for the filing of the petition. Petitioner initially reported onset in June of 2016, as documented in the contemporaneous medical records two months after her first HPV vaccine and as alleged in the petition as the causal vaccination. *See* Pet. Ex. 1 at 277, 274, 309, 350.

While none of petitioner's treating physicians opined that the HPV vaccine caused her alopecia, none definitively ruled it out. Further, the Federal Circuit held that the absence of an express medical opinion of causation is not necessarily dispositive of whether a claim has a reasonable basis. *James-Cornelius*, 984 F.3d at 1379-80.

Respondent argued that the only reference to a "possible causal nexus" between the HPV vaccine and petitioner's condition was in response to a question raised by petitioner's mother to Dr. Yadgir almost 15 months post vaccination. Dr. Yadgir wrote that petitioner's alopecia was "possibly related to Gardasil (but listed as a rare complication of vaccine series)." However, Dr. Yadgir provided no basis for his statement. Second Response at 9; *see also* Pet. Ex. 2 at 68, 74.

Petitioner's burden for reasonable basis is satisfied when there is "more than a mere scintilla of evidence" defined as "evidence beyond speculation that provides a sufficient basis for a reasonable inference of causation." *Cottingham,* 154 Fed. Cl. at 795 (quoting *Sedar*, 988 F.3d at 765). Dr. Yadgir's notation that petitioner's alopecia was "possibly related" to the HPV vaccine, while insufficient to prove causation, is sufficient objective evidence to meet petitioner's burden of more than a scintilla of evidence to satisfy reasonable basis It is immaterial that this statement was in response to petitioner's mother's question or that it was 15 months after the vaccine was administered. Dr. Yadgir documented the possibility that petitioner's alopecia was caused by the HPV vaccine, noting that alopecia is "listed as a rare complication of the vaccine series".  Though he did not provide a citation for his statement, his statement suggests that he was familiar with complications associated with the HPV vaccine which included alopecia, though rare. This reference supported Dr. Yadgir's opinion that petitioner's alopecia was "possibly related" to the vaccine.

Petitioner's other treating physicians did not refute the possibility that petitioner's injury was related to the HPV vaccine. In response to petitioner's mother's expressed concern that petitioner's alopecia was caused by the HPV vaccine, Dr. Englebert noted that while it was unlikely, the cause of petitioner's alopecia may never be determined.  She advised that an adverse event to the manufacturer would be submitted. [18] Pet. Ex. 1 at 482-84. Dr. Englebert therefore did not rule out the connection.

Petitioner need not prove causation to satisfy reasonable basis for the filing of her claim. *See* § 300aa-15(e)(1); *see also Chuisano*, 116 Fed. Cl. at 287; *P.S. v. Sec'y of Health & Human Servs*., No. 16-834V, 2022 WL 16635456, at *18 (Fed. Cl. Spec. Mstr. Oct. 6, 2022). Petitioner's burden for reasonable basis is much lower and is satisfied when there is "more than a mere scintilla of evidence" defined as "evidence beyond speculation that provides a sufficient basis for a reasonable inference of causation." *Cottingham,* 154 Fed. Cl. at 795 (quoting *Sedar*, 988 F.3d at 765). The Federal Circuit in *James-Cornelius* afforded weight to a physician record that documented "??VAERS", finding that it "reflect[ed] evidence that could support finding a reasonable basis for a causal relationship between vaccination and symptoms." 984 F.3d at 1380.

Further, Dr. Koperski stated it was "very unlikely" that petitioner's condition was caused by the HPV vaccine, not that it was definitely unrelated to the HPV vaccine.  *See* Pet. Ex. 5 at 26.

---

[18] It is unknown whether a report was ever submitted since no such document was filed.

13

Reasonable basis requires only that sufficient evidence exist to support a feasible claim of causation. *See Cottingham*, 971 F.3d at 1346. The medical provider statements, medical records, temporal association, and current understanding of alopecia as an autoimmune disease that has been associated with vaccines, is sufficient to satisfy petitioner's burden for a reasonable basis in the filing of the petition.

For these reasons, the undersigned finds that this petition had a reasonable basis when filed and during the pendency of the matter.

### IV. Reasonable Attorneys' Fees and Costs

#### I. Reasonable Attorneys' Fees

The Federal Circuit has approved use of the lodestar approach to determine reasonable attorneys' fees and costs under the Vaccine Act. *Avera v. Sec'y of Health & Human Servs.*, 515 F.3d 1343, 1349 (Fed. Cir. 2008). Using the lodestar approach, a court first determines "an initial estimate of a reasonable attorneys' fee by 'multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate.'" *Id*. at 1347-48 (quoting *Blum v. Stenson*, 465 U.S. 886, 888 (1984)). Then, the court may make an upward or downward departure from the initial calculation of the fee award based on other specific findings. *Id*. at 1348.

Counsel must submit fee requests that include contemporaneous and specific billing records indicating the service performed, the number of hours expended on the service, and the name of the person performing the service. *See Savin v. Sec'y of Health & Human Servs.*, 85 Fed. Cl. 313, 316-18 (2008). Counsel should not include in their fee requests hours, including those by paralegals, that are "excessive, redundant, or otherwise unnecessary." *Saxton v. Sec'y of Health & Human Servs.*, 3 F.3d 1517, 1521 (Fed. Cir. 1993) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983)). It is "well within the special master's discretion to reduce the hours to a number that, in [her] experience and judgment, [is] reasonable for the work done." *Id*. at 1522. Furthermore, the special master may reduce a fee request sua sponte, apart from objections raised by respondent and without providing petitioner notice and opportunity to respond. *See Sabella v. Sec'y of Health & Human Servs.*, 86 Fed. Cl. 201, 209 (2009). A special master need not engage in a line-by-line analysis of petitioner's fee application when reducing fees. *Broekelschen v. Sec'y of Health & Human Servs.*, 102 Fed. Cl. 719, 729 (2011).

#### 1. Reasonable Hourly Rates

A "reasonable hourly rate" is defined as the rate "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Avera*, 515 F.3d at 1348 (quoting *Blum*, 465 U.S. at 896 n.11). In general, this rate is based on "the forum rate for the District of Columbia" rather than "the rate in the geographic area of the practice of petitioner's attorney." *Rodriguez v. Sec'y of Health & Human Servs.*, 632 F.3d 1381, 1384 (Fed. Cir. 2011) (citing *Avera*, 515 F. 3d at 1349). There is a "limited exception" that provides for attorneys' fees to be awarded at local hourly rates when "the bulk of the attorney's work is done outside the forum

jurisdiction" and "there is a very significant difference" between the local hourly rate and forum hourly rate. *Id.* This is known as the *Davis County* exception. *Hall v. Sec'y of Health & Human Servs.*, 640 F.3d 1351, 1353 (2011) (citing *Davis Cty. Solid Waste Mgmt. & Energy Recovery Special Serv. Dist. v. U.S. EPA*, 169 F.3d 755, 758 (D.C. Cir. 1999)).

For cases in which forum rates apply, *McCulloch* provides the framework for determining the appropriate hourly rate range for attorneys' fees based upon the attorneys' experience. *McCulloch v. Sec'y of Health & Human Servs.*, No. 09-293V, 2015 WL 5634323 (Fed. Cl. Spec. Mstr. Sept. 1, 2015). The Office of Special Masters has accepted the decision in *McCulloch* and has issued a Fee Schedule for subsequent years.[19]

Mr. Gage has thirty-two years of legal experience since his admission to the Wyoming State Bar in 1990. Mr. Gage has practiced in the Vaccine Program for many years. Other special masters have awarded Mr. Gage non-forum rates, given that the substantial majority of the work on his cases is performed in Wyoming. *See Auch v. Sec'y of Health & Human Servs.*, No. 12-673V, 2016 WL 3944701 (Fed. Cl. Spec. Mstr. May 20, 2016). Here, Mr. Gage submitted hourly rates for himself of $326 for 2018, $338 for 2019, $350 for 2020, and $364 for 2021. Motion at 17-20. Most of the submitted rates have been upheld by other special masters. *See Ferguson v. Sec'y of Health & Human Servs.*, No. 17-1737V, 2022 WL 1467655 (Fed. Cl. Spec. Mstr. Apr. 12, 2022) (awarding the requested fees from 2018-2020); *Roscoe v. Sec'y of Health & Human Servs.*, No. 11-206V, 2021 WL 3746783 (Fed. Cl. Spec. Mstr. July 30, 2021) (awarding the requested fees from 2018-2020); *Kreizenbeck v. Sec'y of Health & Human Servs.*, No. 08-209V, 2020 WL 5909091 (Fed. Cl. Spec. Mstr. Sept. 15, 2020) (awarding the requested fees from 2018-2020). However, Mr. Gage has previously submitted an hourly rate of $362 for 2021, rather than $364 per hour as submitted here. *See Ferguson*, No. 17-1737V, 2022 WL 1467655, at *2; *Roscoe*, No. 11-206V, 2021 WL 3746783, at *2; Motion at 20. That rate has been upheld, and that is the rate he is awarded here. This results in a **reduction of $2.00**.

Mr. Gage also requested a rate of $112 for his paralegals for 2018-2019. Motion at 22-24. This rate has been upheld by other special masters. *See Williams*, 2019 WL 7482148, at *2 (awarding the requested rate); *Roscoe*, 2021 WL 3746783, at *2 (awarding the requested rate).

Apart from the small reduction from Mr. Gage's 2021 rate, I find the hourly rates billed by Mr. Gage to be reasonable.

**2. Hours Reasonably Expended**

Attorneys' fees are awarded for the "number of hours reasonably expended on the litigation." *Avera*, 515 F.3d at 1348. Counsel should not include in their fee requests hours that are "excessive, redundant, or otherwise unnecessary." *Saxton ex rel. Saxton v. Sec'y of Health &*

---

[19] The 2015-2022 Fee Schedules can be accessed at http://www.cofc.uscourts.gov/node/2914. The hourly rates contained within the schedules are updated from the decision in *McCulloch v. Sec'y of Health & Human Sers.,* No. 09-923V, 2015 WL 5634323 (Fed. Cl. Spec. Mstr. Sept. 1, 2015).

*Human Servs.*, 3 F.3d 1517, 1521 (Fed. Cir. 1993) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983)). "Unreasonably duplicative or excessive billing" includes "an attorney billing for a single task on multiple occasions, multiple attorneys billing for a single task, attorneys billing excessively for intra office communications, attorneys billing excessive hours, [and] attorneys entering erroneous billing entries." *Raymo v. Sec'y of Health & Human Servs.*, 129 Fed. Cl. 691, 703 (2016). While attorneys may be compensated for non-attorney-level work, the rate must be comparable to what would be paid for a paralegal. *O'Neill v. Sec'y of Health & Human Servs.*, No. 08-243V, 2015 WL 2399211, at *9 (Fed. Cl. Spec. Mstr. Apr. 28, 2015). Clerical and secretarial tasks should not be billed at all, regardless of who performs them. *McCulloch*, 2015 WL 5634323, at *26. Hours spent traveling are ordinarily compensated at one-half of the normal hourly attorney rate. *See Scott v. Sec'y of Health & Human Servs.*, No. 08-756V, 2014 WL 2885684, at *3 (Fed. Cl. Spec. Mstr. June 5, 2014) (collecting cases). And "it is inappropriate for counsel to bill time for educating themselves about basic aspects of the Vaccine Program." *Matthews v. Sec'y of Health & Human Servs.*, No 14-1111V, 2016 WL 2853910, at *2 (Fed. Cl. Spec. Mstr. Apr. 18, 2016). Ultimately, it is "well within the Special Master's discretion to reduce the hours to a number that, in [her] experience and judgment, [is] reasonable for the work done." *Saxton*, 3 F.3d at 1522. In exercising that discretion, special masters may reduce the number of hours submitted by a percentage of the amount charged. *See Broekelschen*, 102 Fed. Cl. at 728-29 (affirming the Special Master's reduction of attorney and paralegal hours); *Guy v. Sec'y of Health & Human Servs.*, 38 Fed. Cl. 403, 406 (1997) (same).

Upon review of the hours billed by Mr. Gage, I find that several of the hours spent on this matter are unexplained and questionable. First, there is a discrepancy in the hours billed by Mr. Gage and his expert regarding their communications. Mr. Gage billed approximately 3.95 hours for time spent speaking with Dr. Byers.[20] *See* Motion at 17-20. Mr. Gage billed for phone calls with Dr. Byers on July 30, 2019, October 28, 2019, November 8, 2019, November 18, 2019, January 27, 2020, February 26, 2020, March 3, 2020, April 1, 2020, and May 1, 2020. *Id*. Dr. Byers billed for only 2 hours of work in this case on March 8, 2020, describing her work as "[r]eview of records, expert reports and literature." Dr. Byers did not bill any time for speaking with Mr. Gage.[21] *Id*. at 33. It is unclear whether Dr. Byers simply did not charge for the numerous conversations billed by Mr. Gage, but no explanation for the discrepancy exists in the record.

Petitioner was initially ordered to file an expert report by October 21, 2019. Dr. Byers only billed for two hours of work in this matter on March 8, 2020. Motion at 33. By that time, petitioner had already filed four Motions for Extension of Time, indicating that an expert report was forthcoming. ECF Nos. 20-23. The billing records provide no evidence that petitioner consulted with an expert other than Dr. Byers during that time. Given that Dr. Byers did not bill for work on

---

[20] It is difficult to determine exactly how much time Mr. Gage spent talking with Dr. Byers since he logged 2.7 hours in a single entry for reviewing medical records, talking with Dr. Byers over the phone, and drafting correspondence to his client. *See* Motion at 20. For the purposes of this Motion, I will assume that the phone call constituted half of the time logged for that entry, or 1.35 hours. Thus, 1.35 is added to the time spent speaking with Dr. Byers in other entries, totaling 3.95 hours speaking with Dr. Byers. *See id.* at 18-20.

[21] The reasonableness of Dr. Byers' rate and hours logged is discussed further below.

16

any date other than March 8, 2020, it is unclear whether Dr. Byers failed to bill for all the time she may have spent on this case or whether Mr. Gage sought five total extensions of time within which to file an expert report but did not communicate with any expert during that time.

Respondent argued that Mr. Gage seeks fees for multiple consultations with Dr. Byers for a report that was never filed. Second Response at 9 nt. 2. While it is not unusual for an attorney to consult with an expert then not file a report, it is unacceptable for counsel to seek a total of five Motions for Extensions of Time within which to file an expert report if no efforts to secure an expert report were made. Having failed to file a Reply to respondent's Second Response on the Motion for Fees, there is no explanation from petitioner's counsel to explain the foregoing and the only evidence that exists are the billing records of counsel and Dr. Byers. Summarily, an expert report was ordered to be filed by October 21, 2019. Between October 21, 2019 and March 8, 2020, four Motions for Extension of Time within which to file an expert report were filed and granted. *See* ECF No. 20-23. Mr. Gage's billing records include multiple communications with Dr. Byers during this time frame. *See* Motion at 18-20. However, Dr. Byers' billing records reflect only two hours of work billed on March 8, 2020. *See id.* at 33. Counsel failed to provide an explanation for the discrepancy.

Further, Mr. Gage logged 1.7 hours for time spent conferencing with a paralegal for which there is no corresponding billing entry by any paralegal. Motion at 17-20. The only two paralegals whose billing records were included in the Motion were S.M. and H.N. *Id.* at 22-24. S.M.'s latest entry was on November 22, 2019, and H.N.'s was on June 10, 2019. *Id.* Mr. Gage billed time for conferencing with a paralegal on January 31, 2020, on February 26, 2020, on March 3, 2020, and on June 17, 2020 with no corresponding paralegal billing. *See id.* at 19-20.

Finally, following the filing of five Motions for Extension of Time within which to file an expert report, counsel failed to file an expert report or otherwise communicate with the Court by the deadline set in the last Order. An Order to Show Cause then issued with no response filed. ECF No. 27. The case was subsequently dismissed. ECF No. 28.

Petitioner's counsel is a seasoned and experienced attorney who has practiced in the Vaccine Program for many years. His failure to comply with Court Orders or otherwise respond to the Court during the pendency of this matter, along with the discrepancies contained in his billing records, are unacceptable. Therefore, the total fee in this case is reduced by 25%.

For all the foregoing reasons, the attorneys' fee in this matter is reduced by 25%, resulting in a total fee reduction of **$3,400.65**.

I find that the hours spent by both paralegals are reasonable.

### 3. Reasonable Costs

Petitioner also requested $800.00 for work performed by medical expert Dr. Vera Byers. Motion at 33-34. Dr. Byers billed at a rate of $400.00 per hour for 2 hours of work. *Id.* The billing rate is reasonable and consistent with what Dr. Byers has been awarded in other rulings. *Riley on behalf of E.R. v. Sec'y of Health & Human Servs.*, No. 15-104V, 2021 WL 5177434, at *3 (Fed. Cl. Spec. Mstr. Oct. 13, 2021). The hours expended are also reasonable, given that her time was spent reviewing medical records, expert reports,[22] and medical literature. *See* Motion at 33. Thus, Dr. Byers is compensated in full.

Finally, petitioner requested $834.10 for miscellaneous expenses, such as the filing fee and medical record requests. Motion at 26-32. Petitioner also requested $576.50 for copies made from February 2018 through January 2021, constituting 2,306 copies made throughout that timeframe. *Id.* at 25. These costs are reasonable, and I will compensate them in full.

## V.   Conclusion

Based on the foregoing, petitioner's Motion for Attorneys' Fees and Costs is **GRANTED, in part.** The undersigned finds that it is reasonable to compensate petitioner and her counsel for **total attorneys' fees and costs of $12,412.55,** representing $10,201.95 in fees and $2,210.60 in costs.

Accordingly, the undersigned awards:

> **A lump sum payment of $12,412.55 representing reimbursement for petitioner's attorneys' fees and costs in the form of a check payable jointly to petitioner and her counsel of record, Mr. Richard Gage of Richard Gage, P.C.**

The Clerk of the Court is directed to enter judgment in accordance with this Decision.[23]

**IT IS SO ORDERED.**

**s/ Mindy Michaels Roth**
Mindy Michael Roth
Special Master

---

[22] It is unclear what expert reports Dr. Byers reviewed, as no expert reports were filed in this matter.
[23] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by each party filing a notice renouncing the right to seek review.